2005 OK CIV APP 88

**HARDING & SHELTON, INC.,
Plaintiff/Appellee/Counter–
Appellant,**

v.

**The PROSPECTIVE INVESTMENT AND TRADING COMPANY, LTD.,** Defendant/Third–Party Plaintiff/Appellant/Counter–Appellee,

and

**Consolidated American Resources, L.L.C.,
Third–Party Defendant/Appellee/Counter–
Appellant.**

**No. 100,424.**

Court of Civil Appeals of Oklahoma, Division No. 4.

Sept. 20, 2005.

---

Gregory L. Mahaffey, Lee D. Groeneveld, Mahaffey & Gore, P.C., Oklahoma City, OK, for Plaintiff/Appellee/Counter–Appellant Harding & Shelton, Inc., and Third–Party Defendant/Appellee/Counter–Appellant Consolidated American Resources, L.L.C.

Frank D. Spiegelberg, John L. Randolph, Jr., Pray Walker Jackman Williamson & Marlar, Tulsa, OK, for Defendant/Third–Party Plaintiff/Appellant/Counter–Appellee The Prospective Investment and Trading Company, Ltd.

Opinion by RONALD J. STUBBLEFIELD, Judge.

¶ 1 These are multiple appeals from judgments in the third of a series of lawsuits dealing with ownership of a leasehold interest and resulting liability. Defendant and Third–Party Plaintiff Prospective Investment and Trading Company, Ltd. (PITCO), appeals from the Trial Court's money judgment in favor of Plaintiff Harding & Shelton, Inc. (Harding & Shelton) and Third–Party Defendant Consolidated American Resources, L.L.C. (Consolidated or, jointly, Operators). Operators appeal from the Trial Court's post-judgment order severely limiting their recovery of attorney fees and costs.[1] Based on our review of the record and applicable law, we affirm the principal judgment in favor of Operators, reverse the Trial Court's order on attorney fees and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

¶ 2 PITCO acquired an interest in mineral leases covering the Metzler and Holcomb properties (the Metzler leases) in 1996. The leases contained one well, the Metzler No. 1–13, and production from that well ceased in 1997. Harding & Shelton became the operator of the Metzler leases on January 1, 1999, and Consolidated purchased "top leases" from the mineral owners on March 25, 1999.[2] The interplay between PITCO's interest in the "base leases," Consolidated's interest in the "top leases" and Harding & Shelton's interest as operator has led to the three lawsuits.

1. The two appeals have been consolidated by order of the Oklahoma Supreme Court with the second designated as a counter-appeal.

2. A top lease is a "lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated." 8 Williams & Meyers, Oil and Gas Law, 1115 (2004).

¶ 3 The mineral interest owners, with Operators' backing, filed a lawsuit (Lawsuit # 1) against PITCO and other lease holders to have the base leases declared terminated for lack of production. While Lawsuit # 1 was pending, Consolidated filed a pooling application with the Oklahoma Corporation Commission to conduct a workover of the Metzler well. While both Lawsuit # 1 and the Commission proceedings were pending, PITCO filed another lawsuit to force Operators to offer it an interest in the top leases on the grounds they were renewals of the base leases (Lawsuit # 2).

¶ 4 The Commission entered a forced pooling order on February 20, 2001, for the workover, by deepening and recompletion of the Metzler well, naming Harding & Shelton operator. The order required interest owners to elect to participate in the workover, by paying their proportionate share of the estimated costs, or alternatively by accepting a royalty interest. It did not address the uncertain status of PITCO's interest.

¶ 5 Thereafter, PITCO filed a motion to reopen and correct the pooling order to allow for "deferred payment of cost for formations currently behind pipe in the Metzler ... well." PITCO wanted to participate in the "recompletion" of the Metzler well into producing formations at depths it already reached, but not in the "deepening" of the well into other formations. PITCO withdrew its request when it reached an agreement with Operators. The letter agreement, dated April 4, 2001, allowed PITCO to defer prepayment until Operators were ready to recomplete the well into the shallower zones and provided that PITCO's prepayment would be placed in an escrow account "dedicated to re-completion" of the Metzler well. The letter agreement stipulated that Operators did not admit the validity of PITCO's interest.

¶ 6 Lawsuit # 1 resulted in a judgment declaring the base leases cancelled for lack of production. The judgment did not determine the effective date of the cancellation. PITCO continued to pursue Lawsuit # 2, unsuccessfully seeking a partial summary adjudication to fix the termination date of the base leases to support its argument that the top leases were renewals of the base leases.

¶ 7 On May 29, 2001, PITCO tendered its share of the estimated recompletion costs, $44,375.54, to Operators with a letter attempting to place a condition on its participation:

> As [Operators] are also claiming the interest shown above and per the terms of the OCC order as amended by letter agreement dated April 4, 2001, we expect one of these companies to match these funds in the escrow account. Evidence supporting the deposit of like funds by [Operators] should be included in the escrow account information provided to PITCO. Should the dispute regarding ownership in the Metzler be dismissed by action of the court or by PITCO the funds submitted herewith shall be returned to PITCO within forty-eight (48) hours of written notice....

Operators refused to accept PITCO's condition and, in a response letter dated May 29, 2001, stated:

> [W]e can only accept your prepayment under the terms of the above Order and the April 4, 2001, Letter Agreement. We cannot accept your prepayment under any caveat of PITCO's disputed ownership.... If you do not wish to submit this prepayment under the terms of the above Order and the Letter Agreement as it currently exists, notify us within 48 hours and we will return the check to you. Otherwise we will consider your prepayment as being submitted under the terms provided under OCC Order No. 449256 and the April 4, 2001, Letter Agreement as they currently exist and none other. Also, to reiterate, there should be no inference in our acceptance of your funds that we in any way recognize any ownership you may claim.

PITCO does not deny receiving the letter, but did not request the return of its prepayment.

¶ 8 It became apparent in early 2002 that the workover had yielded disappointing results at a higher than estimated cost. Operators capitulated to PITCO's demand on April 22, 2002, and offered it an interest in the Metzler leases upon payment of its share of the excess costs and $75 per acre.

Without responding to the offer, PITCO dismissed Lawsuit # 2 with prejudice, and demanded the return of its "conditional" prepayment, which Operators refused.

¶ 9 Harding & Shelton filed this lawsuit (Lawsuit # 3) on May 10, 2002, seeking a judgment for $10,934.11 for PITCO's share of the excess expenses, and also seeking foreclosure of its statutory lien (42 O.S.2001 § 145) against PITCO's interest in the Metzler leases. PITCO denied liability and filed a counterclaim for the prepayment.[3] PITCO then filed an amended answer, counterclaim and third-party petition against Consolidated on the same claim it had stated against Harding & Shelton.

¶ 10 The Trial Court conducted a bench trial and later issued judgment in favor of Operators on all claims. It granted Harding & Shelton a judgment for $8,265.49 and foreclosed the lien on PITCO's interest in the Metzler leases. Although the judgment does not specify the basis for the holding, the Trial Judge stated his reasoning in an earlier hearing: "PITCO elected to participate and as such obligated themselves for certain expenses." Thereafter, the Trial Court awarded Operators attorney fees and costs of $1,056.44, although they had sought an award of $39,803.72.

¶ 11 PITCO appeals from the Trial Court's judgment. Operators appeal from the amount of the order awarding attorney fees.

## DISCUSSION OF ISSUES

### I. The Principal Judgment

#### A. Standards of Review

¶ 12 In its brief in chief, PITCO succinctly states the overriding issue confronting this appellate court: "By 'electing to participate' in the recompletion of the Metzler well, did PITCO 'obligate' itself, whether equitably or legally, for the payment of recompletion and operating costs on the well?" The parties admit they cannot determine whether the Trial Court relied on legal or equitable principles in reaching its conclusion, but agree on the standard of review to be applied in either case.

¶ 13 If a judgment from a bench trial relies on a legal theory, this Court will affirm the Trial Court's findings of fact if there is any competent evidence to support them, giving the findings of fact the same force they would have if they were made by a well-instructed jury. *K & H Well Serv., Inc. v. Tcina, Inc.*, 2002 OK 62, ¶ 9, 51 P.3d 1219, 1223. We cannot reconsider the credibility of witnesses or the effect and weight of the evidence on a legal theory. *Robert L. Wheeler, Inc. v. Scott*, 1991 OK 95, ¶ 12, 818 P.2d 475, 480.

¶ 14 If a judgment depends on equitable principles, we will examine the entire record and weigh the evidence, but will not reverse unless the judgment is clearly against the weight of the evidence. *Id.* at ¶ 12, 818 P.2d at 479–80. We review *de novo*, under our "plenary, independent and non-deferential authority," the Trial Court's holdings of law, including its determination regarding application of 42 O.S.2001 § 147.1 to Operators' application for an attorney fee. *K & H*, 2002 OK 62 at ¶ 9, 51 P.3d at 1223.

#### B. Preliminary Statement

¶ 15 We begin our analysis with the observation that all parties to this litigation are sophisticated and canny players in Oklahoma's oil and gas economy. In this lawsuit, they have assumed positions diametrical to those they held through two lawsuits and a Corporation Commission proceeding. Although the material evidence is largely uncontested, the inferences to be drawn from that evidence have been hotly contested and support widely divergent results. We accept the reasonable inference that all parties reevaluated their positions once the workover results were known.

#### C. Legal Issues

¶ 16 PITCO contends there is no legal basis for the payment obligation recognized

---

**3.** In late November 2002, PITCO received a check from Harding & Shelton for revenue from the Metzler well. The check was deposited in the normal course of business, but when the accounting department could not match the payment to a specific well, management determined that it was for the Metzler lease and placed the funds in a suspense account.

by the Trial Court and argues that the Commission lacked jurisdiction to compel it to pay a portion of the workover costs because it never had record title. It also argues that there was no contract to that effect between the parties and that its prepayment of costs was conditional.

¶ 17 Our analysis requires a distinction between the Commission's subject matter and personal jurisdiction. The Commission "is a tribunal of limited jurisdiction with its powers and authority conferred by the Oklahoma Constitution and statute." *Pelican Prod. Corp. v. Wishbone Oil & Gas, Inc.,* 1987 OK CIV APP 74, ¶¶ 8–9, 746 P.2d 209, 211. "[I]t has the sole authority to adjust the equities and to protect the correlative rights of interested parties [in oil and gas matters]." *Id.* (footnote omitted).[4] Without a doubt, the Commission had subject matter jurisdiction to consider Consolidated's pooling application. *See Vastar Res., Inc. v. Okla. Corp. Comm'n,* 1996 OK CIV APP 35, ¶ 9, 917 P.2d 480, 483.

¶ 18 The Commission also has primary jurisdiction to determine if an election was effective. *See Samedan Oil Corp. v. Corp. Comm'n,* 1988 OK 56, 755 P.2d 664. Once interest holders elect under a pooling order and the option period ends, the interests vest and can no longer be extinguished unless there is some "vitiating infirmity" in their creation.[5] *Crest Res. & Exploration Corp. v. Corp. Comm'n,* 1980 OK 133, ¶ 8, 617 P.2d 215, 218. If a dispute arises regarding the rights under a pooling order, the Commission has primary jurisdiction to determine the interest holders' rights and liabilities under the order. *Arkla Exploration Co. v.*

*Shadid,* 1985 OK CIV APP 40, ¶ 9, 710 P.2d 126, 128.

¶ 19 PITCO's argument is addressed to the Commission's personal jurisdiction— that the Commission could not compel PITCO to pay a portion of the workover costs. The Commission's order, however, did not compel payment, but allowed interest holders to elect to participate by making payment. PITCO chose to avail itself of the terms of the pooling order based on its assertion that it owned an interest. Indeed, PITCO voluntarily appeared before the Commission to oppose Consolidated's application and sought to modify the order, although it dropped that effort after entering the letter agreement. By voluntarily appearing and seeking affirmative relief and by electing to participate, PITCO waived its objection to the Commission's jurisdiction. *Greyhound Lines, Inc. v. Corp. Comm'n,* 1967 OK 80 ¶ 0, 430 P.2d 1 (Syllabus 1). Moreover, even if the Commission's order is flawed for its failure to address the uncertain status of PITCO's interest, PITCO had standing as a "person affected by" the order to appeal or seek a modification to clarify that status. 52 O.S.2001 § 112; *see also Forest Oil Corp. v. Corp. Comm'n,* 1990 OK 58, ¶ 9, 807 P.2d 774, 781. However, it did not do so.

¶ 20 PITCO's attack on the Commission's order is an impermissible collateral attack. 52 O.S.2001 § 111. "A collateral attack is an attempt to avoid, defeat, evade, or deny the force and effect of a final order or judgment in an incidental proceeding other than by appeal, writ of error, certiorari, or motion for new trial." *Nilsen v. Ports of Call Oil Co.,* 1985 OK 104, n. 5, 711 P.2d 98,

4. "Correlative rights" are "the rights and duties which exist between mineral owners with regard to a common source of hydrocarbon supply." *Pelican Prod. Corp. v. Wishbone Oil & Gas, Inc.,* 1987 OK CIV APP 74, ¶¶ 8–9, 746 P.2d 209, 211–12 (footnote omitted).

5. The term "vitiating infirmity" has not been specifically defined in Oklahoma case law, despite its frequent use in this subject area. However, our review of cases using the term leads us to conclude that it refers to an order that is void for lack of some fundamental jurisdictional or procedural requirement. *See SKZ, Inc. v. Petty,* 1989 OK 150, ¶¶ 11–12, 782 P.2d 939, 943 (com-

mission order is subject to collateral attack only if it is void for lack of jurisdiction, a "vitiating infirmity"); *Eason Oil Co. v. Howard Eng'g, Inc.,* 1990 OK 101, ¶¶ 8–14, 801 P.2d 710, 713–15 ("vitiating infirmity" assumed to mean void *ab initio* ); and *Ouellette v. State Farm Mut. Auto. Ins. Co.,* 1994 OK 79, n. 37, 918 P.2d 1363, 1369 (lack of notice apparent from the face of the judgment roll is a "vitiating infirmity;" (citing the discussion in *Timmons v. Royal Globe Ins. Co.,* 1985 OK 76, nn. 5–6, 713 P.2d 589, 591–92, allowing post-appeal construction of a judgment from the judgment roll only)).

101. When considering a collateral attack, a court may not go beyond determining whether the judgment is void on the face of the judgment roll. *Id.* at n. 6, 711 P.2d at 101. "A collateral attack may not be launched on a Commission order facially invulnerable. A district court's power to inquire into the validity of Commission orders is legally limited to ascertaining if [the] Commission had jurisdiction to issue the order." *Pelican,* 1987 OK CIV APP 74 at ¶ 13, 746 P.2d at 212 (footnote omitted). The failure to address the uncertain nature of PITCO's interest is not a "vitiating infirmity" apparent on the face of the order that renders it void. Therefore, the Commission had jurisdiction to enter the pooling order and PITCO cannot seek a redetermination here of the terms of its participation under that order.

■ ¶ 21 Further, PITCO and Operators entered into a permissible agreement "to enlarge or otherwise define the terms set forth in the pooling order." *Tenneco Oil Co. v. El Paso Natural Gas Co.,* 1984 OK 52, ¶¶ 1–2, 687 P.2d 1049, 1050; *see also Nilsen,* 1985 OK 104 at ¶¶ 17–19, 711 P.2d at 102–03. The agreement allowed PITCO to limit its participation to certain producing formations "behind pipe." As a sophisticated player, PITCO knew it could have also tried to obtain a formal agreement to condition its election on the successful adjudication of its interest.

¶ 22 PITCO argues vehemently that it did place such a condition upon its participation, but the evidence establishes otherwise. Although PITCO made a demand for the condition in the letter accompanying its payment, Operators refused to accept the condition. Operators sent a letter to PITCO refusing to accept PITCO's payment on any terms other than those set forth in the pooling order and letter agreement and offering to return PITCO's payment if it did not find those terms acceptable. PITCO does not deny receiving that letter, but did not ask for return of its payment. PITCO's attempt to make its participation conditional therefore failed.

¶ 23 PITCO chose to participate in the workover under the terms of the pooling order. Although it obtained a letter agreement to clarify certain terms of its participation, it did not obtain an agreement to condition its participation on the validity of the interest it claimed. PITCO's continuing obligation is based in contract as well as in the pooling order. The Trial Court's order finding PITCO liable for its share of the costs under the pooling order is supported by legal theories.[6]

### D. Equitable Issues

■ ¶ 24 The parties accuse each other of "riding the well down." *Samedan Oil Corp. v. Corp. Comm'n,* 1988 OK 56, ¶ 8, 755 P.2d 664, 668. PITCO asserts that Operators fought its involvement until they realized that the workover would not be as profitable as originally hoped, and suddenly wanted PITCO to share the burden of the expenses. On the other side of the coin, Operators accuse PITCO of wanting a "free look" down the well with the option of denying its interest once the results of the workover were apparent. As the Trial Court stated in response to PITCO's mid-trial motion for directed verdict at the close of Operators' case:

> [T]his is almost a situation of now you see it, now you don't. It just depends on which side of the mirror you want to look on what image you see.... [T]here is evidence which, if I decide to believe it, indicates to me that there is, at the very least ... equitable title not only evident but which was proclaimed ... very vociferously from time to time, by your clients.

We conclude that, even if legal theories did not support the Trial Court's judgment, the weight of equity does.

■ ¶ 25 PITCO argues that equity should not aid Operators because they are guilty of inequitable conduct. Indeed, it is the rule that "[e]quity will not lend its aid to one seeking its active interposition, who has

---

6. Although it is tempting to pursue PITCO's argument that it cannot be liable under the pooling agreement because it does not actually have record title to an interest in the well, that fact is not relevant to the issue at hand. In essence, by failing to successfully condition its acceptance of the terms of the pooling order, PITCO has managed to achieve what it sought for so long—an interest of some sort in the reworked Metzler well—even if that interest is only contractual and despite the fact that PITCO no longer wants the interest.

been guilty of unlawful or inequitable conduct in the matter with relation to which he seeks relief." *Camp v. Camp,* 1945 OK 234 ¶ 0, 163 P.2d 970 (Syllabus). The clean hands doctrine certainly applies where equity is concerned, but this case presents the question of whose hands are dirtier. "The doctrine of 'clean hands' is not rigid, and it does not operate so as to repel all sinners from a court of equity; as [it] is aimed at securing justice and equity." *Smith v. Williamson,* 1953 OK 115, ¶ 0, 256 P.2d 174, 176 (Syllabus 5).

¶ 26 While all of the parties have reached the point where they are thoroughly suspicious of each other's motives, we cannot ascertain what Operators should have done differently, short of immediately acceding to PITCO's demands (which, of course, they ultimately did). Operators properly notified PITCO of the pooling proceeding and PITCO participated fully in the Commission hearings. Operators entered into a letter agreement with PITCO to accommodate its desire to participate in only part of the recompletion. The only thing Operators refused to do until the very end was to accept PITCO's claim that it had an ownership interest. Even when PITCO elected to participate in the workover, Operators immediately communicated their refusal to accept the conditions of PITCO's late attempt to modify aspects of the agreement, and even offered to return its prepayment. When PITCO did not ask for the return of the prepayment, Operators were entitled to assume PITCO was participating without the conditions.[7]

¶ 27 We agree with PITCO that the specific elements necessary to set up a promissory estoppel against it are not present, nor are the specific elements of equitable estoppel. *See Barber v. Barber,* 2003 OK 52, ¶ 7, 77 P.3d 576, 579, and *Sullivan v. Buckhorn Ranch P'ship,* 2005 OK 41, ¶ 31, 119 P.3d 192, 201. If anything, this situation probably fits most neatly into the category of judicial estoppel.

This doctrine provides a party who knowingly assumed a particular position dealing with matters of fact is estopped from assuming an inconsistent position to the prejudice of the adverse party. This rule ordinarily applies to inconsistent positions assumed in the course of the same judicial proceeding or in subsequent proceedings where the parties and questions are identical.

*Capshaw v. Gulf Ins. Co.,* 2005 OK 5, n. 28, 107 P.3d 595, 602.

¶ 28 Nonetheless, a court's equitable jurisdiction does not depend on specific authority. *Merritt v. Merritt,* 2003 OK 68, ¶ 13, 73 P.3d 878, 883. Equity's purpose is to "promote and achieve justice with some degree of flexibility," and requires courts to examine "the particular circumstances of the case." *Id.* (quoting *Garrett v. Arrowhead Improvement Ass'n,* 826 P.2d 850, 855 (Colo. 1992)). At its most basic, "[e]quitable estoppel is employed to prevent one party from taking a legal position inconsistent with an earlier action that places the other party at a disadvantage." *Merritt,* 2003 OK 68 at ¶ 15, 73 P.3d at 883. It "holds a person to a representation made, or a position assumed, where otherwise inequitable consequences would result to another, who has in good faith, relied upon that representation or position." *Id.* (citing *Oxley v. Gen. Atl. Res., Inc.,* 1997 OK 46, ¶ 20, 936 P.2d 943, 947).

¶ 29 PITCO argues that equitable title cannot be imposed against a party's will, but PITCO actively pursued title for several years. Its late-in-the-game tactical change does not alter the character of the actions it took to bolster its claim while it was pursuing title. PITCO also asserts that Operators will receive 115% of the actual drilling costs as a result of the judgment, while they would have suffered no harm from refunding PITCO's prepayment. We do not accept this premise. Because PITCO's interest is coming out of the portion originally claimed by

---

7. Although PITCO portrays Operators' later payment of production revenue as an attempt to "sneak in" a payment to bolster their position in this matter, PITCO could have immediately returned the funds, but chose to place them in a suspense account instead. While PITCO's decision does not play a large part in our weighing of the equities, it apparently did have some effect on the Trial Judge and we do not view his decision as against the clear weight of the evidence. *See Robert L. Wheeler, Inc. v. Scott,* 1991 OK 95, ¶ 12, 818 P.2d 475, 479–80.

Consolidated, the result of the judgment in Operators' favor is that Consolidated will not bear as much of the expense as it otherwise would have borne. The fact that the judgment in their favor benefits Operators does not mean that it is incorrect or inequitable.

¶ 30 In a situation quite similar to the one facing the Trial Court here, the Supreme Court relied on general equitable principles. *Samedan Oil Corp. v. Corp. Comm'n*, 1988 OK 56, 755 P.2d 664. Samedan held an interest in a pooled leasehold where Lincoln Rock was named the operator. *Id.*, at ¶ 1, 755 P.2d at 665. Samedan failed to make a timely election under the original pooling order, but attempted to elect under a subsequent order issued only to correct a typographical error. *Id.*, 755 P.2d at 666. Lincoln Rock refused Samedan's election, resulting in a third order declaring that "all parties having made affirmative elections under [the second] order shall be bound by those elections." *Id.* However, just before that order was issued, the well was completed as a marginal producer. When Lincoln Rock billed Samedan for its share of additional costs, Samedan contended it was not actually a participant because it had not timely paid its share of the up-front well costs. A fourth Commission order declared Samedan a participant pursuant to the third order. In affirming that order, the Supreme Court, with the following analysis that is particularly relevant to this situation, concluded:

> Samedan and Lincoln Rock accuse each other of riding the well down. Both parties urge that equity is on their respective sides. The maxim of he who seeks equity must do equity applies here. Equity will not relieve one party against another when both are *pari delicto. Where both are equally in the wrong, the appellee [Lincoln Rock] holds the stronger ground.* [Samedan] assertively sought participation.... We cannot accede to Samedan's argument to utilize select provisions of the Pooling Orders to assert inconsistent positions

based upon the favorable or unfavorable result of the well.

*Id.* at ¶ 8, 755 P.2d at 668 (emphasis added). We are persuaded by the reasoning in *Samedan.* The equities favor Operators and, even if they did not, they do not favor PITCO, the appellant, so as to support overturning the judgment in favor of Operators, the appellees. Equity "is used to prevent injustice." *Sullivan*, 2005 OK 41 at ¶ 30, 119 P.3d at 201.

¶ 31 The Trial Court did not err in determining that PITCO created an interest in the Metzler well through its contractual dealings with Operators and through its participation in the pooling process and its course of conduct. Further, while there is evidence to support the opposite conclusion, the Trial Court's decision is not against the clear weight of the evidence. *See Robert L. Wheeler, Inc. v. Scott*, 1991 OK 95, ¶ 12, 818 P.2d 475, 479–80. Because we conclude that the Trial Court did not err in determining that PITCO created an interest by electing to participate in the well, we also conclude that the Trial Court did not err in ordering the foreclosure of Harding & Shelton's lien on that interest.[8]

## II. The Attorney Fee Appeal

¶ 32 The Trial Court awarded Operators attorney fees and costs of $1,056.44, although they had sought an award of $39,803.72. Operators contend that the Trial Court erred as a matter of law by limiting the award based on the Court's determination of the effect of 42 O.S.2001 § 147.1.

### A. Standard of Review

¶ 33 The determination of which statute applies to the successful party's request for attorney fees presents a question of law. We review the Trial Court's holdings of law de novo under our "plenary, independent and non-deferential authority." *K & H Well Serv., Inc. v. Tcina, Inc.*, 2002 OK 62, ¶ 9, 51 P.3d 1219, 1223.

---

8. We also note that there was some question, not fully explored by the parties on appeal, of the former leaseholders being entitled to compensation for their rights in the equipment used in the original well. If so, PITCO had an existing property interest in that equipment affixed to the realty, even if it had no other interest.

## B.  Discussion

¶ 34 The Trial Court concluded that section 147.1 limited Operators' recovery of attorney fees and costs.  Title 42 of the Oklahoma Statutes is entitled "Liens."  Chapter 3 of that Title deals with "Mechanics and Materialmen," and section 147.1, found in Chapter 3, in pertinent part provides:

> Any property owner or other interested party, including but not limited to mortgagees, contractors, subcontractors and others against whom a lien claim is filed under the provisions of the law relating to mechanics' and materialmen's liens, may at any time discharge the lien by depositing with the county clerk in whose office the lien claim has been filed either:  An amount of money equal to one hundred twenty-five percent (125%) of the lien claim amount;  or a corporate surety bond with a penal amount equal to one hundred twenty-five percent (125%) of the lien claim amount. . . .
>
> . . . .
>
> The bond shall:  Name the lien claimant as obligee and the party seeking the release as principal;  be executed by both the principal and the surety;  have a proper power of attorney attached if executed by an attorney-in-fact;  be executed by a corporate surety authorized to transact business in this state;  and be conditioned that the principal and surety will pay the full amount of the claim as established in any appropriate court proceeding, plus any court costs and attorney's fees awarded the lien claimant, but in no event shall the liability of the principal or surety under the bond exceed the bond penalty.  The preceding clause shall not limit the common law liability of the party who created the indebtedness upon which the lien claim is based.  The conditions of any bond filed pursuant to this section shall be deemed to comply with the requirements hereof, regardless of the language or limitations set forth therein, if both the principal and surety intend that the bond be filed to secure a lien release under this section.
>
> The cash deposit or bond, as the case may be, shall stand in lieu of the released lien, and the lien claimant must proceed against the substituted security in the same time and manner as is required for foreclosure of a lien claim.  The cash deposit or bond shall stand liable for such principal, interest, court costs and attorney's fees to the extent they could be awarded in a lien foreclosure proceeding.
>
> . . . .

¶ 35 The Trial Court apparently concluded that the statute limited total recovery—the sum of the judgment amount, attorney fee award, and costs—of the prevailing party to the 125% amount specified.  We conclude that the Trial Court erred.

¶ 36 The clear purpose of section 147.1 is to provide a mechanism by which property owners may effect the release of liens on property while still disputing the amount of the indebtedness underlying the lien claim. The law does this by requiring the posting of cash or bond obligation for 125% of the amount of the lien claim, and then directing that "the lien claimant must proceed against the substituted security in the same time and manner as is required for foreclosure of a lien claim."  However, the 125% limitation of recovery specified in the law is not a total limitation on the amount recoverable from the party contesting the lien, as is apparent by the statute's (1) language which limits liability of the principal or surety "under the bond;" and (2) clear directive that the limitation of liability language "shall not limit the common law liability of the party who created the indebtedness upon which the lien claim is based."

¶ 37 The statute allows the property owner to discharge a lien, but it does not allow the discharge or limitation of all liability.  If we interpreted section 147.1 in this manner, as PITCO argues, then the statute would countermand the entitlement to "reasonable" attorney fees found in two statutes under which Operators seek recovery, 42 O.S.2001 § 176, and 12 O.S. Supp.2004 § 936.  In addition, such an interpretation of the law could result in vastly disparate outcomes, dependent upon whether a party can discharge a lien.  That would raise equal protection issues.

¶ 38 From our review of section 147.1, this Court does not discern a legislative intent to limit total liability, as found by the Trial Court. We reiterate that the 125% limitation is a limit upon liability under the bond that was posted to effect release of the lien. It is not a limit of PITCO's total potential liability.

¶ 39 The record on appeal demonstrates that the Trial Court's award of attorney fees was based solely on determination of the legal effect of section 147.1, and, therefore, we cannot conclude that the lower court determined a reasonable fee for Operators. Because this Court does not make first instance determinations, we reverse the attorney fee award and remand with instructions to the Trial Court to determine and award a reasonable prevailing-party attorney fee for Operators in accordance with the criteria set forth in *State ex rel. Burk v. City of Oklahoma City,* 1979 OK 115, 598 P.2d 659.

¶ 40 In a separate, specifically identified portion of their brief-in-chief in their counter-appeal, Operators ask this Court to award them a prevailing-party appellate attorney fee. *See* Okla. Sup.Ct. R. 1.14, 12 O.S.2001, ch. 15, app. 1. We conclude that Operators are entitled to such a fee based on the authorizing statutes set forth above. Accordingly, we grant the application, and direct that the Trial Court on remand also award Operators a reasonable attorney fee for both defense of the appeal of PITCO, and the successful appeal of the lower court's attorney fee award.

### CONCLUSION

¶ 41 After close analysis, this Court concludes that the Trial Court did not err in ruling in favor of Operators, whether its analysis and judgment were based on legal or equitable principles.[9] However, we do find that the Trial Court erred in its determination that 42 O.S.2001 § 147.1 limited the recovery by Operators of a reasonable attorney fee. We reverse that judgment and remand with instructions as set forth in this opinion.

9. Because the Trial Court's decision is supported by several different theories, we will not reverse, as PITCO urges, for lack of specificity. *See Mer-*

¶ 42 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.

RAPP, V.C.J., and GOODMAN, P.J., concur.

*ritt v. Merritt,* 2003 OK 68, ¶ 17, 73 P.3d 878, 883.